CCIVPEYS                    Sentence

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          10 CR 918 (RPP)

NATAN PEYSAKOV,

                Defendant.

------------------------------x

                                        New York, N.Y.
                                        December 18, 2012
                                        10:24 a.m.


Before:

                HON. ROBERT P. PATTERSON, JR.,

                                        District Judge


                        APPEARANCES


PREET BHARARA,
     United States Attorney for the
     Southern District of New York
SARAH Y. LAI
     Assistant United States Attorney

ALBERT Y. DAYAN
     Attorney for Defendant

ALSO PRESENT:  REBECCA VASSILAKOS, FBI

CCIVPEYS                          Sentence

```
 1                 (In open court)
 2                 THE DEPUTY CLERK:  United States v. Nathan Peysakov.
 3                 Is the government ready in this matter?
 4                 MS. LAI:  Yes.  Sarah Lai.  With me is Special Agent
 5      Rebecca Vassilakos from the FBI.
 6                 MS. VASSILAKOS:  Good morning, your Honor.
 7                 THE DEPUTY CLERK:  And defendant ready?
 8                 MR. DAYAN:  Yes, defense is ready.  Albert Dayan for
 9      defense.
10                 THE COURT:  Good morning, Mr. Dayan.  And good
11      morning, Mr. Peysakov.
12                 I have the sentencing minutes before me, and I
13      corrected those minutes, but they evidently were not sent back
14      down to the court reporter.  And they are so full of errors
15      that I don't think I can sentence this defendant.  It's
16      absolutely incomprehensible.
17                 MS. LAI:  Which date is the Court looking at, because
18      he came back and we allocuted before the Court.
19                 THE COURT:  This is March 8.  I agree with you I
20      brought him back here some time later, but I haven't been
21      furnished with the final minutes.
22                 MS. LAI:  I have a July 5th, 2012.
23                 THE COURT:  I don't have those before me.
24                 MS. LAI:  I'm happy to share my copy with the Court or
25      we can adjourn it.
```

CCIVPEYS                          Sentence

1            THE COURT:  All right.

2            (Pause)

3            THE COURT:  These minutes seem to be somewhat

4     satisfactory.

5            I have my copy of the minutes.  And I felt the

6     allocution was satisfactory to plead to the crime.  It's not

7     entirely clear to me what the extent of the defendant's

8     participation was.  He talks about runners, and I take it that

9     runners were some class of people whom he for some reason knew.

10    But that's not articulated as to actually how they fit into the

11    picture.

12           MS. LAI:  Your Honor, my understanding is that because

13    the defendant worked at more than one clinic, not the lead

14    defendant's clinic, not Total Body Diagnostics, he worked at

15    these other clinics.  And through his work in the various

16    clinics, he got to know runners who brought patients to those

17    other clinics.

18           THE COURT:  Why would you need a runner to operate a

19    clinic?

20           MS. LAI:  Well, they steer auto accident victims to

21    particular clinics in exchange for a payment per patient.  So

22    that's basically how it worked.  They had people on the street.

23    I'm not saying that they worked for him specifically as his

24    subordinates, but these runners know which clinics accept auto

25    accident victims, and which clinics are willing to pay in order

1   to get referrals for those patients.  And so through his work

2   at the various clinics, he got to know these runners.  And

3   because he knew the lead defendant, he also referred patients

4   to Aron Chervin's clinic so that they can receive these --

5          THE COURT:  You mean the clinics in the city use

6   runners to retract patients?

7          MS. LAI:  Not if they operate legitimately, because it

8   is, in fact, illegal to pay for patient referrals.  But in this

9   case, obviously these runners were getting paid, and that's

10  part of the overall scheme, is that they used runners to refer

11  patients to them.  These runners, they have contacts at

12  hospitals, they have contacts at ambulance services, so they

13  know when there's an accident victim.

14         THE COURT:  They are called ambulance chasers.

15         MS. LAI:  I was trying to avoid using that term,

16  because it usually applies to lawyers.  But, yes, that's

17  essentially what they are.

18         THE COURT:  They work for lawyers.

19         MS. LAI:  They'll make referrals to lawyers, to

20  clinics, to various medical services like x-ray laboratories.

21         THE COURT:  But in this case, all he knew was they

22  worked for the clinics.

23         MS. LAI:  Yes.

24         THE COURT:  That he worked for them.

25         MS. LAI:  He worked for the clinics, right, and the

1    runners worked --

2              THE COURT:  Is that --

3              MR. DAYAN:  If you don't mind, Judge, in my

4    experience --

5              THE COURT:  Not your experience.  In this case.

6              MR. DAYAN:  This case.  Right.

7         In my experience with this case, Judge, different

8    participants with different involvements.  You have runners,

9    you have doctors, obviously, and you have patients.  This

10   defendant -- and it was never alleged that Mr. Peysakov was

11   ever a runner, nor was he ever associated with runners.

12        As I had outlined in my papers, he did know a doctor.

13   And when Chervin called him and asked him for a referral,

14   obviously for a fee, the defendant made such a referral.  But

15   he was not that type of a runner that basically hustles and

16   tries to get cases from the street, nor does he chase

17   ambulances.

18             THE COURT:  You're disagreeing with Ms. Lai.  You're

19   disagreeing by what you say with Ms. Lai.

20             MR. DAYAN:  I'm not sure if she --

21             THE COURT:  You say he didn't associate with runners.

22   But you have to associate if he accepted referrals from

23   runners.

24             MR. DAYAN:  I'm not sure if Chervin was a runner in

25   this case, Judge.

CCIVPEYS                    Sentence

 1          THE COURT:  What?

 2          MR. DAYAN:  I'm not sure if Chervin was a runner in

 3   this case.  Is Ms. Lai describing him as a runner?

 4          THE COURT:  No.  What she's saying is that he accepted

 5   business from further clinics from runners, that's all.

 6          You limited it to merely the referral of a doctor.

 7   You don't, in your response, say anything about the association

 8   with the runners or what role the runners played in this with

 9   him.  I want to know whether there's a dispute of fact here or

10   not.

11          MR. DAYAN:  If I may confer with Ms. Lai.  Can I do

12   that briefly, Judge?

13          THE COURT:  Yes, you may.

14          (Pause)

15          MR. DAYAN:  Judge, if there's any differences between

16   what I said and Ms. Lai, I would agree with Ms. Lai's

17   representation.

18          THE COURT:  I want to know from the defendant.  I want

19   to be sure he understands.

20          THE DEFENDANT:  Okay.  Yeah, I understand.

21          THE COURT:  I don't know whether you understand.

22   You'll have to tell me what you understood.

23          THE DEFENDANT:  I agree with Ms. Lai.

24          THE COURT:  What?

25          THE DEFENDANT:  I agree with what she say.

1    THE COURT:  No, no.  That's not good.  I don't know

2    what you're agreeing with.  You'll have to tell me.

3         (Pause)

4         THE COURT:  Before you answer me, this has to be not

5    what Mr. Dayan told you, not what Ms. Lai told you, not what

6    the agent told you, but what you remember of your own

7    knowledge, what you know, that you know happened is true.

8         Now, it's got to be that.  It's not what Mr. Dayan

9    tells you, because I'm not sure Mr. Dayan understands the full

10   extent of this.

11        THE DEFENDANT:  The runners told me, and I know I

12   can't refer them to any clinics.

13        MS. LAI:  The runners called me and I knew I can --

14        MR. DAYAN:  You're not clear.

15        THE DEFENDANT:  If the runners call me, and I knew

16   they have a patient, and they can refer it to the doctors, I

17   did refer it to the doctors.

18        THE COURT:  To what doctors?  To Mr. Chervin or to

19   your doctors and your clinic?

20        THE DEFENDANT:  It's not my clinic.  I work as a

21   manager.  But doctor who worked in the clinic, Dr. Rodriguez.

22        MR. DAYAN:  Dr. Rodriguez he said.  Dr. Gibbs and Dr.

23   Rodriguez.

24        MS. LAI:  So Dr. Gibbs and Dr. Rodriguez, your

25   Honor -- Dr. Gibbs, as the Court knows, worked for Total Body

CCIVPEYS                    Sentence

1    Diagnostics. Dr. Rodriguez also did. He was one of the names

2    that came up when the expert was testifying about the various

3    medical reports that he reviewed as part of this expert

4    examination.

5         THE COURT:  And who did Dr. Rodriguez work for,

6    Mr. Peysakov?  You don't have to talk to Mr. Dayan to answer

7    that question.

8         MR. DAYAN:  The name of this --

9         THE COURT:  No, you don't have to talk to him.  Answer

10   the question.

11        THE DEFENDANT:  Dr. Rodriguez worked for his clinic,

12   his clinic DXR, Ocean Medical, and Dr. Gibbs worked for Total

13   Body Diagnostic.

14        THE COURT:  Total Body.

15        THE DEFENDANT:  Total Body, yes.

16        MR. DAYAN:  Judge, I'm sorry if he seems a little

17   nervous, because we didn't really prepare for this type of

18   discussion.

19        THE COURT:  I know, but that's because we have these

20   constant interruptions in the previous proceeding for you to

21   talk to him, and there's a problem because that creates a

22   problem.

23        And did you refer Dr. Rodriguez to Mr. Chervin?

24        THE DEFENDANT:  No, no, I didn't refer Dr. Rodriguez

25   to Mr. Chervin.

CCIVPEYS                          Sentence

1          THE COURT:  I didn't understand it.

2          THE DEFENDANT:  No, I did not refer Dr. Rodriguez to

3     Mr. Chervin.

4          THE COURT:  Who was the physician that you referred to

5     Mr. Chervin?

6          THE DEFENDANT:  I thought --

7          MR. DAYAN:  You got to talk to the judge.

8          If you don't remember, just say "I don't remember."

9          THE DEFENDANT:  I'm not sure.  I don't remember who

10    was it.

11         MS. LAI:  Your Honor, I think there might be some

12    misunderstanding here.  My understanding -- and I don't want to

13    put any words in the defendant's mouth, and he should feel free

14    to correct me if I'm wrong, but my understanding is that he

15    referred patients to doctors.

16         THE DEFENDANT:  Yes.

17         MS. LAI:  Not that he referred doctors, but he

18    referred -- and that's what he allocuted to in July.

19         THE DEFENDANT:  Yes, yes, that's correct.

20         THE COURT:  You worked for a clinic?

21         THE DEFENDANT:  Yes.

22         THE COURT:  And runners brought patients to the

23    clinic?

24         THE DEFENDANT:  Sometimes, yes.

25         THE COURT:  And was Dr. Rodriguez a doctor at the

CCIVPEYS                        Sentence

1    clinic?

2              THE DEFENDANT:  Yeah, it was his clinic.  His clinic

3    it was.  And if I got a client --

4              THE COURT:  What did you understand the relationship

5    was between Dr. Rodriguez and Dr. Gibbs?

6              THE DEFENDANT:  They don't have any relationship.

7              THE COURT:  And Mr. Chervin.

8              THE DEFENDANT:  They don't have any relationship.

9              Dr. Gibbs send his Dr. Braunstein to the Dr. Rodriguez

10   office.

11             THE COURT:  Did you recommend Dr. Braunstein?

12             THE DEFENDANT:  Dr. Braunstein come to the Dr.

13   Rodriguez office.

14             THE COURT:  Did you recommend Dr. Braunstein to Dr.

15   Chervin -- I mean to Mr. Chervin?

16             THE DEFENDANT:  No, no.  I know Dr. Braunstein through

17   Aron Chervin, from Aron Chervin.

18             THE COURT:  And what role -- what did you understand

19   she did?

20             THE DEFENDANT:  She's a doctor.  She worked for doctor

21   office for Dr. Gibbs.  Dr. Gibbs worked with Aron Chervin.

22             THE COURT:  I understand that.  What did you

23   understand was wrong about the relationship between Dr. Gibbs

24   and Dr. Braunstein?

25             THE DEFENDANT:  Because professional/nonprofessional

CCIVPEYS                              Sentence

1    can't be work together.  And Aron is nonprofessional, and Dr.

2    Gibbs professional.  They work as a partner.  They can't work

3    as a partner.

4              MR. DAYAN:  He said that --

5              THE COURT:  I'm sorry.  I'm sorry.

6              Did you understand who ran Total Body Diagnostics?

7              THE DEFENDANT:  Aron Chervin, yes.

8              THE COURT:  You understood that Dr. Gibbs owned Total

9    Diagnostics?

10             MR. DAYAN:  Do you understand the question?

11             THE DEFENDANT:  No, I don't.

12             THE COURT:  You understood that Total Diagnostics was

13   in Dr. Gibbs's name?

14             THE DEFENDANT:  Yes, I do.

15             THE COURT:  Did you understand that Aron Chervin would

16   bill for --

17             THE DEFENDANT:  For Dr. Gibbs?

18             THE COURT:  For the services of Dr. Braunstein and Dr.

19   Rodriguez?

20             THE DEFENDANT:  Yes.

21             THE COURT:  All right.  I guess that's -- is that

22   sufficient, Ms. Lai?

23             MS. LAI:  Maybe just ask him who he understood to be

24   in control -- who controlled Total Body based on what he knew.

25             THE COURT:  Who controlled Total Body based on what

1    you knew at the time?

2              THE DEFENDANT:  At the time -- at that time, I knew

3    Aron Chervin controlled Total Body.

4              MS. LAI:  Thank you, your Honor.

5              THE COURT:  Thank you very much.

6              All right.  Let's proceed then.

7              I have before me a presentence report which was

8    prepared on May 8th -- or April 27th, and finalized on May 8th,

9    2012.

10             Have you and Mr. Peysakov read this or has it been

11   read to Mr. Peysakov, and are there any changes to be made in

12   it, Mr. Dayan?

13             MR. DAYAN:  If your Honor is talking about the PSR?

14             THE COURT:  Yes.

15             MR. DAYAN:  Judge, Ms. Lai had pointed out something

16   to my attention today that on Page 23 of the PSR, Paragraph 93,

17   in that paragraph, the defendant makes a declaration to the

18   probation officer that according to the defendant, the

19   defendant's monthly cash flow statement, he earns $5700 in

20   business income; his spouse earns about 4,000; additionally,

21   the defendant also receives $1,000 in rental income.  As such,

22   the total household income is $10,695; thus, his monthly cash

23   flow is approximately 3900.  It remains unexplained how the

24   defendant meets his monthly expenses, given his reported

25   earnings.

CCIVPEYS                          Sentence

1          And what the defense has an issue with is the next

2     chart down.  It says that adjusted gross income, which is for

3     the year 2010, lines one, two, three, four from the top, it

4     says that 2010, the adjusted gross income that the defendant

5     allegedly had reported was $15,245.

6          MS. LAI:  Negative.

7          MR. DAYAN:  I'm sorry?

8          MS. LAI:  Negative.

9          THE COURT:  Negative.

10         MR. DAYAN:  Negative, right.  I'm sorry.  Negative 15.

11         The defense position that that is some sort of

12    misunderstanding, Judge, because the defendant has a specific

13    recollection of filing income taxes for 2010 that where he

14    showed income of over $80,000.

15         The probation officer may have been -- may have

16    misunderstood the income taxes, because there was a loss that

17    he had sustained in Florida investment, a home that he

18    purchased in Florida, and maybe that somehow was deducted for

19    future deductions.  I don't know how that could have happened.

20    But if that makes any difference for your Honor's position at

21    sentencing, we really take a position that that has to be a

22    mistake, somehow that the probation officer may have misread

23    the income tax papers.  Because on the one hand, in Paragraph

24    93, the defendant tells her that his income is over 10,000, and

25    then the adjusted gross --

1          THE COURT:  This has nothing to do with total capital

2    gains; but these are supposedly taken from the federal income

3    tax returns he provided for the years 2009, 2010, and 2011.

4          MR. DAYAN:  His wife also makes $75,000.  She works

5    for a very big pharmaceutical company.  And that's why we

6    really feel that was a mistake, that 15,000.  I'm sorry I

7    didn't notice it earlier, Judge.  I don't know how that could

8    appear here.  His wife was gainfully employed; she makes over

9    75,000.  He makes -- he says he declared a substantial amount

10   in 2010.

11         MS. LAI:  Your Honor, the reason I came in a little

12   bit late was because I wanted to verify exactly this point.

13         I spoke with the probation officer.  I asked her to

14   look again at the tax returns that the defendant provided.  And

15   she reported to me that for adjusted gross income, Line 37 of

16   the tax form, those are the numbers that were on the forms that

17   the defendant gave.

18         So the reason why I pointed this out to Mr. Dayan and

19   now to the Court is because it goes to the character of the

20   defendant; has he been honestly reporting income to the IRS as

21   he's supposed to.  And how does he explain away all of this --

22   as the probation officer noted, his expenses far exceed his

23   reported income.  And so there's an unexplained component of

24   his income which partly derives from fraud, and partly we can't

25   explain.

CCIVPEYS                    Sentence

1            MR. DAYAN:  Judge, if I may, I think that the

2      probation officer has also overlooked that the defendant and

3      his wife file separate income taxes.  She earns over $75,000,

4      so -- and obviously they are married, as the letters indicate,

5      and they live together.  There may be some cross-communication

6      over here, Judge.  And if the issue is important for the Court,

7      and I'm sorry that I didn't notice this earlier, and I agree

8      that it goes --

9            THE COURT:  This only says that she looked at his;

10     doesn't say she looked at the two of them, two returns.  It

11     doesn't say they looked at the joint returns.  It says he files

12     separately, I don't know.  If he sold the house, that's another

13     matter.

14           MR. DAYAN:  No, he didn't sell the house.  If you see

15     on the same Page 93 -- I mean 23, the expenses are joint

16     expenses, they live together, and --

17           THE COURT:  Well, wait a minute.  In 93?  93 does not

18     purport to be the income tax returns.

19           MR. DAYAN:  I'm saying page --

20           THE COURT:  Doesn't purport to be that, but 94 does.

21           MR. DAYAN:  I'm saying Page 23 on top, it shows the

22     expenses, the joint expenses, on Page 23.  That's the same

23     page.

24           THE COURT:  Right.  But those are just household

25     expenses.

1          MR. DAYAN:  Right.  And they are shared by the

2     defendant and his wife.

3          And, like I said, she's gainfully employed.  She was

4     interviewed -- I believe she was interviewed by the probation

5     department.

6          THE COURT:  Yes.  I don't quite understand -- I think

7     there's -- what are we going to do?  Are we going to send it

8     back to probation so six months later -- what do you want to

9     do?  You brought it up.  Ms. Lai, I guess you brought it up.

10         MS. LAI:  It depends on whether the Court considers it

11    an important factor in sentencing, your Honor.

12         THE COURT:  Well, if it's false, of course it's an

13    important factor.  I can't tell whether it's false.

14         MS. LAI:  I don't know whether the information in the

15    tax return is false, since we are not investigating the

16    defendant for tax evasion.  All I'm pointing out at this point

17    is that if he says that the tax returns he provided to

18    probation somehow contained an error, it's something that's

19    worth noting.

20         THE COURT:  I don't think he's saying that.  He said

21    he filed -- as I read the thing, it says he provided his

22    federal income tax returns, which she says reveal the

23    following.  But now his lawyer says that they didn't file joint

24    returns, which is usual, but they filed individual returns

25    separately.

CCIVPEYS                          Sentence

1              MS. LAI:  I understood Mr. Dayan to be telling me

2    earlier that he thinks that these numbers are wrong; that

3    that's not what the defendant reported.  So if I'm wrong about

4    that --

5              MR. DAYAN:  The defendant's position is that he showed

6    a substantial income, and that if this means that he was at a

7    loss of 15,000, that's just --

8              THE COURT:  If his wife made $75,000, that wouldn't be

9    on the return --

10             MR. DAYAN:  No.

11             THE COURT:  -- if they didn't file jointly.  I'm not

12   sure what you're saying.

13             MR. DAYAN:  What I believe may have happened in this

14   case, that he had declared over $80,000 --

15             THE COURT:  But you should have kept copies of

16   whatever he supplied.

17             MR. DAYAN:  I looked through my file.  I can't find

18   his income tax papers.  I always do keep --

19             (Pause)

20             MR. DAYAN:  Judge, I can tell you that, and defendant

21   can declare to your Honor he did not misrepresent anything to

22   the income tax -- when he filed income tax papers.  Absolutely

23   not.  He had a professional accountant.  Like I said, he had

24   lost a home.  Maybe somehow they had adjusted that, and I think

25   the word is amortization, something like -- and sort of maybe

1    that's shown on the income tax papers.  But he did not

2    misrepresent anything on the income tax papers, Judge.

3              THE COURT:  When did he sell the home?  Approximately.

4              MR. DAYAN:  In 2010.  That was the same year that they

5    filed the income tax.  And he had a loss of approximately

6    $100,000, right?

7              THE COURT:  You may have a loss.

8              MR. DAYAN:  Right.  That's what happened, Judge.

9              THE COURT:  Did he take it or did his wife take the

10   sale of the home?

11             THE DEFENDANT:  I took the loss.  I took the loss.

12             THE COURT:  All right.

13             MR. DAYAN:  Judge, unfortunately, I don't have copies

14   of the income taxes.  But, like I said, Judge, the defendant

15   has always been forthcoming with the income tax -- he has an

16   accountant, he --

17             THE COURT:  All right.

18             He and his wife though lived together all this time,

19   didn't they?

20             MR. DAYAN:  Yes, they do; they are married.

21             THE COURT:  Didn't they have two or three children?

22             MR. DAYAN:  They have three children now.

23             THE COURT:  They had two then.  I don't understand.

24   Then the number of exemptions should have been three.  I don't

25   understand how that works.

CCIVPEYS                        Sentence

 1              MR. DAYAN:  Well, they just -- they had a baby in

 2     2012.

 3              THE COURT:  I understand that.  You usually take your

 4     own as one exemption, and then whoever is the dependents as the

 5     others.  Anyway, I don't know how -- I'm not going to take that

 6     into account.  It's a matter between the defendant and the IRS,

 7     and his wife and the IRS, if it is a problem.

 8              All right.

 9              Any other changes in the presentence report?

10              MR. DAYAN:  Judge, if I may, just one more thing.

11              The defendant just refreshed my recollection.  After

12     this arrest, he was audited by the IRS.  Not pursuant to the

13     government, not pursuant to this case, but just coincidentally

14     he was audited.

15              And when were you audited?

16              It was about January or February 2011.  They went

17     through all his papers, the family, and there was -- they

18     didn't even -- he didn't even have to pay -- they just asked

19     that he would have to pay additional for some construction work

20     that he did.  But there was nothing improper about his income

21     taxes that was found.  And he was audited from A to Z.

22              THE COURT:  All right.

23              And he's paid the difference in taxes?

24              MR. DAYAN:  Yes.  It was a difference between -- he

25     did a construction, and they said you can't deduct for

1    everything; that's only partial you can deduct.

2            So you paid, right?

3            Yes, he says he paid for everything, Judge.

4            THE COURT:  Okay.

5            Any other changes in the presentence report that you

6    want to --

7            MR. DAYAN:  Not from the defense.

8            MS. LAI:  Not from the government, your Honor.

9            THE COURT:  All right.

10           I have before me also a letter from Mr. Dayan dated

11   December 12th, an earlier letter dated July 12th, and I don't

12   believe I have anything from the government on this sentencing,

13   am I correct, Ms. Lai?

14           MS. LAI:  That's correct, your Honor.

15           THE COURT:  All right.

16           Then I'll hear from you on sentencing, Mr. Dayan.

17           Oh, yes, attached to Mr. Dayan's letter of December

18   12th are the report cards of his children as Exhibit A showing

19   the rank as gifted and talented children, both Linda and --

20   Linda, anyway.  And the other is for Lauren.

21           Then there's a letter from Mr. Peysakov, which is

22   undated but -- and then also there's a letter from Anastasiya

23   Peysakhova, who's the defendant's wife; and a letter from Anna

24   Peysakhova, who is the defendant's mother; and a letter from

25   Pavel Vishnevetskly -- I guess I'm pronouncing that right --

CCIVPEYS                    Sentence

1    the person from the New York Association of Holocaust

2    Survivors; and a letter from New York Association of Holocaust

3    Survivors, Pavel Vishnevetskly, which is the second letter, I

4    guess.  And then there's two honor role awards for Linda

5    Peysakov; and for Lauren Peysakov, Certificate of Excellence.

6            And I've looked at those documents.

7            Should I have anything else before me?

8            MR. DAYAN:  Not from the defense, Judge.  You have

9    some -- I received some drawings from his daughters, but I

10   think I included them as exhibits.  The family wanted me to

11   submit them.

12           THE COURT:  All right.

13           You can hand them up, if you want.

14           Award for Lauren.  I think I've seen the Certificate

15   of Excellence for Lauren, and the honor role awarded to Linda.

16   The Student of the Month for Lauren, and a drawing of flowers

17   by Lauren, and a drawing of a house and trees -- excuse me, a

18   house and dog by Lauren.  And a picture of trees, I guess, by

19   Lauren.  Trees and flowers.

20           All right.

21           I'll hear from you on sentence, Mr. Dayan.

22           MR. DAYAN:  Thank you, Judge.

23           On behalf of Mr. Peysakov, Judge, I had attempted to

24   articulate a position where a man who was basically raised in

25   the former Soviet Union, and went through military service

CCIVPEYS                     Sentence

1    there, and really went through a very complex type of a

2    youthful upbringing.  And I had attempted to reconcile that

3    with the way that type of a young man finds himself in the

4    United States.

5              And what I have attempted to explain was that when you

6    grow up in a country that where the government -- whatever the

7    government tells you is not always the best thing; in other

8    words, when you grow up in a tyrannical country like the Soviet

9    Union, a lot of people there, they disagree with the

10   government's statutes, they disagree with the government's

11   positions.  And because many of the rules and regulations of

12   that government are not really right, they are not really the

13   best thing for the people; they are more for the government

14   itself, a tyrannical government.

15             So I believe what happened with someone like

16   Mr. Peysakov, they come to this country with this state of mind

17   that you don't always have to listen to what the government

18   says, because whatever the government says may not always be

19   the right thing.  And it takes time.  It's a gradual process.

20             See, for someone who comes here to this country when

21   they are very young, it's different.  Like myself, I came here

22   when I was ten.  He came here, he was already -- he was already

23   established; he was already -- his mental state, he was already

24   a developed young man.  I'm not making an excuse for what he

25   did, Judge.  I'm just saying that he is otherwise a good and a

CCIVPEYS                    Sentence

decent man.  He's otherwise a hardworking man, as I had tried
to explain in my papers, Judge.

         When I say that he is the source of an American family
in the making, what I meant by that was the classic American
family, where the father provides for his children, educates
them in school, in religion, in home, he is the source of all
that.  He is the one who provides for them.  And that shows
that he is a man of great character; a man who devotes and
sacrifices his life for the welfare of his children and his
family.  And that's why I tried to reconcile, Judge, with the
man who actually came here from the Soviet Union.

         And I don't want to be redundant about everything I
had written, Judge.  All I'm asking is that your Honor please
do not incarcerate him, because it would really be a traumatic
shock for this family.

         He has two young daughters who are of tender years,
and he really spends a lot of time with them.  He really spends
a lot of time with them.  I think that if he's incarcerated at
a place like MDC or MCC, the daughters -- the mother may
decide -- the parents may decide not even to take the daughters
to that type of an environment.  And I understand, Judge, that
the common response is, Well, he should have thought of that
before he engaged in this type of activity.

         I don't believe that Mr. Peysakov appreciated,
appreciated, that one day he would be here in federal court;

1    that there would even be a risk of him being in this type of a

2    position where he would have to really beg for not to be

3    incarcerated.

4        I appreciate the disposition we had worked out with

5    the government.  He had pled guilty, Judge.  He's willing to

6    take -- he's actually already working on getting the $75,000,

7    which is the amount of the loss in this plea agreement.  He

8    wants to pay that back right away; he doesn't want to stall and

9    pay bimonthly payments.  He really wants to do the right thing,

10   Judge, and move on.  He learned a great lesson, your Honor.  It

11   is a great lesson not only for Mr. Peysakov, but for all his

12   generations.  He will teach his children, he will teach his

13   grandchildren that in this country, the United States, you live

14   a law-abiding life, you pay your taxes on time, you do nothing

15   that's even gray.  Because when you come home at night, after a

16   hard day's worth of work, and you know you did everything

17   properly, you didn't violate any laws, you'll be happy.  And

18   that's what's worth it.  It's not worth to extend yourself and

19   expose yourself to any criminal prosecution.

20       I ask your Honor most sincerely, really this is -- he

21   is an unusually good man.  And I'll tell you why, Judge.  In

22   the last week, it was a very big holiday for Jewish people; it

23   was a holiday of Hanukkah; it was miracle of lights.  And I

24   wasn't really -- he asked me not to really talk about this, but

25   I really feel as his lawyer I should.

1        He and his brother, who's sitting in the courtroom

2    today, actually right there, they actually -- they made a very,

3    very generous donation to a very small local synagogue on Ocean

4    Avenue, where a lot of immigrant Russian people go attend.  And

5    they donated a Torah, which is a very large -- I don't know, I

6    think it's called a scroll.  It's not inexpensive.  And they

7    donated it.  They paid for a beautiful Hanukkah party.

8        And I walked in, because they asked me to come, and I

9    couldn't say no.  And I walked in, and I saw all these

10   immigrant children playing and having a good time, and food.

11       I think that Mr. Peysakov will never, never commit any

12   crime.  I think that the lesson is tremendous, Judge.  It's a

13   tremendous wake-up call for this young man, who's otherwise a

14   good American, Judge.  Works hard, pays his taxes.  He's good

15   to his mom, Judge.  That says a lot about a person.  As you

16   see, the letters from the Holocaust organization, he helps,

17   Judge.  He is not just a man who basically lives for himself.

18   He gives himself to his family, to people who need him.

19       I ask your Honor not to incarcerate this man

20   because -- and I understand that the sentencing guidelines,

21   they are not so shocking in this case.  But because of the

22   perhaps irreparable harm that this may cause to his children,

23   who are honor students, Judge -- both of them are honor

24   students, he studies with them, he does everything with them,

25   Judge -- I ask your Honor not to sentence him to a custodial

period of time.  In fact, I wanted to go out and ask your Honor

for the following, that -- I've learned -- and I told this to

Ms. Lai, and she told me that she would object, but I've

learned this week that it cost the United States government

approximately $5,000 a year to keep a defendant on supervised

release.

If your Honor feels that this defendant is not -- does

not need supervision, your Honor is actually free to sentence

him to time served, the time that he's spending in jail from

arrest to arraignment or conditional discharge.  I'm just

making these suggestions to you, because there's no need to --

this case has been pending for about two years.  That's like

supervised release.  He's been complying.  He's always

attended.  Never uses drugs.  Does not drink, except socially.

For all those reasons, Judge, I'm asking you to

consider not sentencing him to incarceration.

THE COURT:  In the presentence report, Paragraph 38,

it says that -- it first mentions Judson Dario Just, and it

mentions Mr. Peysakov, and others not named herein, managed

these medical crimes, that's talking about his clinic, which he

allegedly managed, to maximize the inflated medical billings

that were submitted to insurance companies.

Now, the charge there is that he knew that the

billings of his own medical clinic were inflated, billings to

insurance companies.  I don't know whether you focused on that

CCIVPEYS                        Sentence

1     or not.

2                 MR. DAYAN:  I did discuss this with Mr. Peysakov.  And

3     he is not an owner, Judge, of any clinic.

4                 THE COURT:  It didn't say he was an owner; it said he

5     managed the clinic.  Did he manage the clinic or was he a

6     worker?

7                 MR. DAYAN:  I just want to get the name of the clinic.

8                 (Pause)

9                 MR. DAYAN:  DXR is the clinic where Mr. Natan Peysakov

10    worked.  He had worked there for the clinic, assisting the

11    clinic in obtaining the business, because Mr. Peysakov spoke

12    Russian.

13                THE COURT:  I understand.

14                MR. DAYAN:  Right.  He spoke Russian.  And so

15    basically he had assisted, that is true, Judge.  That is true.

16    But he never got involved, as I had written in my letter --

17                THE COURT:  Wait a minute.

18                So you're saying he was an assistant manager, or what

19    have you, who received patients through the runners, right?

20                MR. DAYAN:  Correct, Judge.  Correct.

21                THE COURT:  Now, did he then, on behalf of those

22    persons whom he brought in, arrange for inflated medical

23    billings by his clinic?

24                MR. DAYAN:  That is absolutely not accurate.  And I

25    want to explain how, Judge.  He never got involved with the

CCIVPEYS                         Sentence

 1  treatment.  He never got involved with the doctor's treatment.

 2  He never got involved with that.  And that's why I try to

 3  separate him in my papers, differentiate between someone like

 4  him and others who basically were partners with the doctor, who

 5  pressured doctors to inflate.

 6          THE COURT:  I understand.

 7          MR. DAYAN:  His income wasn't even that great from

 8  that clinic.  I believe he earned about $1,000 every two weeks,

 9  I believe.

10          THE COURT:  He was on salary?

11          MR. DAYAN:  He was on salary.  He wasn't even --

12          THE COURT:  Did he inflate the bills for the clinic so

13  that they could overbill the insurance companies?

14          MR. DAYAN:  Absolutely not, Judge.

15          THE COURT:  Did he have knowledge that that was going

16  on?

17          MR. DAYAN:  Absolutely not, Judge.  He did not have

18  knowledge that it was inflated, because he never got involved

19  with the medical treatment.  His job was to assist the clinic

20  in getting the patients.

21          And I understand that the government may say, Well, of

22  course he knew.  But that was never part of -- they never

23  alleged it.

24          THE COURT:  There are two different situations here.

25  There are those billings for his clinic, the one he worked for;

1    and then there are the billings for Total Body Diagnostics that

2    were performed by his clinic, but were billed by Total

3    Diagnostics, as I understand it, and then Dr. Gibbs and

4    Mr. Chervin.  So there are two different sets of inflated bills

5    here that are potentially inflated bills.  So I'm trying to

6    isolate on these two.

7              MR. DAYAN:  If I may.

8              THE COURT:  Yes.

9              MR. DAYAN:  I believe the facts are that DXR would

10   have a physician that would make like a house call to Total

11   Body Diagnostics, or the other way around.  I think that's what

12   happened here.  And maybe in the scheme of things, the industry

13   itself, people can -- I can't say that -- I don't know what was

14   inside his mind, did he suspect.  I don't know whether the

15   government's theory would have been at trial on the conscious

16   avoidance.  But I can tell your Honor that the defendant -- and

17   I could say this unequivocally -- that the defendant never got

18   involved with the medical treatment at all of any of the

19   physicians.  That was not -- he wasn't making -- he wasn't --

20   unlike Aron Chervin, he was not a partner; he was not making

21   percentages of anything.  He had no incentive to get involved

22   with medical billing.

23             THE COURT:  Did he get paid by Aron Chervin for the

24   number of persons he referred to Total Body Diagnostics?

25             MR. DAYAN:  Yes.

1          THE COURT:  So he got a kickback, in other words, for

2     sending the people.

3          MR. DAYAN:  Yes.

4          THE COURT:  How much money did he make?

5          MR. DAYAN:  Anywhere between 20 and 30,000 that he

6     made directly from Aron Chervin.  He's saying he's giving the

7     highest number possible.

8          THE COURT:  I'd ask the government, do they agree with

9     what Mr. Dayan says, that that was the way in which he got

10     paid, or do you find that he had knowledge of the other

11     clinic's billing practices?

12          MS. LAI:  We have no evidence to contradict that

13     that's the amount that ended up in his own pocket.

14          But as to whether he understood that Total Body

15     Diagnostics was billing unnecessarily, he had to have known.

16     Why would you refer patients to a clinic that is controlled by

17     a nonhealthcare professional if you believe that the clinic was

18     operating entirely aboveboard.  That just makes no sense.  And

19     you're getting a kickback for those referrals.  That makes no

20     sense, your Honor.

21          MR. DAYAN:  Judge, it may make no sense to us, because

22     we've seen so many of these cases.  But there are people who --

23     there are people out there who try to establish a fraudulent

24     clinic, but the fraud sort of like stops at the illegal

25     association.  In other words, they attempt to legitimize it

1    by -- I understand that the clinic, the structure itself is

2    fraudulent, because you have a nonprofessional partner with a

3    professional.  But they try to legitimize it by sort of saying,

4    Well, we don't provide non -- we don't provide nonnecessary

5    type of treatment.  And that's not unusual.  I mean the clinic

6    itself is still fraudulent, but there are individuals who

7    attempt to somehow legitimize that.

8            THE COURT:  Even in his own clinic, the runners --

9    they paid the runners, didn't they, for bringing in clients.

10           MR. DAYAN:  That is true, Judge.  But it doesn't mean

11   that he ever believed that these runners provided patients who

12   were not in need of actual service or --

13           THE COURT:  I follow you.

14           But that, of course, I would think would be illegal

15   anyway.

16           MR. DAYAN:  Absolutely.  No, absolutely, Judge.

17           THE COURT:  He joined a company that was engaged in

18   illegal activities.

19           MR. DAYAN:  Absolutely, Judge.

20           And I understand that legally he may be responsible

21   for --

22           THE COURT:  I'm just trying to assess it in terms of

23   his culpability, and also in light of your argument that this

24   type of conduct probably -- in view of what I read in the paper

25   about the extent of corruption in Russia, this would not be a

CCIVPEYS                          Sentence

1    great shock to him, whereas it might be to someone who was

2    brought up in this country.

3              MR. DAYAN:  And I think -- I just want to go on,

4    Judge.

5              It is a tremendous shock being here.  There's no

6    question about it.  Doesn't matter whether he's Russian or not,

7    that's a shock.  But I want to just go on just one more fact.

8              I'm not trying to -- I'm not trying to justify that

9    these associations between professionals and nonprofessionals,

10   I'm just saying that in their own mind, they begin to

11   rationalize that, yes, it's fraudulent, our association or

12   creation of this clinic.  But since we don't provide

13   unnecessary treatment, and since all our patients really need

14   assistance, what are we doing that's so wrong.  Unfortunately,

15   that's how they -- unfortunately, and I repeat that word again,

16   that's how they think.  And obviously it's going to stop,

17   because I think that there's just more and more of these cases,

18   and it's a prevailing issue in the Russian-speaking community.

19             And I ask your Honor, that even for general

20   deterrence, this is a unique case, because really he's a great

21   dad.  He's just a good father, Judge.  And he devotes so much

22   time to his children.  It just would be a shock to the whole

23   family.

24             For all those reasons...

25             THE COURT:  All right.

1          Ms. Lai, would you like to respond?

2          MS. LAI:  Just very briefly, your Honor.

3          The government seeks a guideline sentence in this

4    case.

5          The defendant's first argument was that -- it's

6    basically a cultural argument.  But the fact is he was born in

7    1971.  He arrived in the U.S. in 1997 at the age of 26.  When

8    the offense was committed in 2010, he had been here for 13

9    years, so that is --

10          THE COURT:  Did he speak English when he came?

11          MS. LAI:  I don't know, your Honor.  I don't know when

12   he came whether he spoke English.  I think Russian is certainly

13   his first language; he's much better at it.

14          So he spent most of his adult life in the U.S.  He

15   sought the benefits of U.S. citizenship, so he can hardly now

16   blame his cultural heritage, after having deliberately come to

17   this country and sought all the benefits of U.S. citizenship.

18          THE COURT:  When did he become a citizen?

19          MS. LAI:  That was in 1997.  Actually, I'm not sure.

20   Maybe 2003.  He may have become a citizen through marriage, but

21   I'm not 100 percent sure about that, your Honor.

22          And regardless of whether or not he personally did the

23   billing, or whether he personally provided medical care to the

24   patients, the reality is that in this business what he's doing

25   is he's offering injured human beings as a profit center to

CCIVPEYS                         Sentence

1    these clinics that he knew to have been run illegally.  And the

2    Court saw a couple of those witnesses testify.  I mean they had

3    serious car injuries; they went in looking for help.  And they

4    get referred through the likes of Mr. Peysakov to clinics that

5    are not doing them any good, and in some cases positively

6    harming them as a result.  Now, he may not have known all this

7    individual-by-individual, but he certainly knew all the

8    possibility as he was doing it.

9              And while I don't doubt that he's a good family man

10   and he's good to his children --

11             THE COURT:  I don't see why he had knowledge that they

12   were going to perform unnecessary tests, things of that sort,

13   so they could bill for them.

14             MS. LAI:  Because to be paid 20 to $30,000 in

15   kickbacks, I mean there's got to be a way that the clinic can

16   make up that money that they are paying out in kickbacks.

17             THE COURT:  That doesn't seem to necessarily follow.

18             I do follow your point that the kickbacks are illegal

19   per se, and it's commercial bribery.  I do pick up that.  But I

20   don't see that it would mean that he would necessarily know

21   that they were going to overbill for their business.  They

22   might absorb it as part of their overhead, what have you, I

23   don't know.  I don't know how much he was paid per person.  If

24   it's an outrageous percentage, then, of course, you're right.

25             MS. LAI:  Unfortunately --

1          THE COURT:  Head count could be easily taken care of

2     maybe.

3          MS. LAI:  I agree, your Honor.

4          But regardless of how you -- if the head count -- if

5     the amount per patient that he was paid was low, that means he

6     referred a lot of patients.  And if the head count -- the

7     amount per patient he was paid was high, then he's got to

8     question how they can possibly pay me that much money per

9     patient.  So either way you cut it, it doesn't weigh in his

10    favor, I think.

11         Obviously the Court has complete discretion to draw

12    whatever inferences it wishes, but I think from the

13    government's view, given the way he understood the business to

14    operate, given the fact that his own clinic was paying runners,

15    he had to have known that there was some amount of overbilling

16    happening.  Maybe he didn't know the full extent, but he had to

17    have known that some of it was happening.

18         THE COURT:  When you say "his own," it was not owned

19    by him.

20         MS. LAI:  No, no, I understand.  But he was the

21    manager.

22         THE COURT:  He was a manager, I gather.

23         MS. LAI:  A manager.  Okay.

24         THE COURT:  Not one of many, but at the same time, as

25    I understand it; is that right?

CCIVPEYS                          Sentence

1              MS. LAI:  I think he was the manager.

2              THE COURT:  Single employee manager?  The only one?

3              MS. LAI:  I think he was the manager, your Honor.

4              Apparently the agent has interviewed the doctor, and

5     the doctor only referred to one manager.

6              THE COURT:  The doctor being?

7              MS. LAI:  Dr. Rodriguez, your Honor.

8              THE COURT:  I see.

9              Is he the head doctor?

10             MS. LAI:  Yeah, he was the owner on record of the

11    clinic.

12             THE COURT:  All right.

13             MS. LAI:  And, in addition, I was saying that I'm sure

14    that the defendant himself -- I don't doubt that he's a good

15    family man, a good father, that he provides for his family.  I

16    don't know what the likelihood of recidivism is; I can't read

17    his heart.  But at least for general deterrence purposes, your

18    Honor, we cannot have a case where a clinic manager is

19    referring patients in this manner, and the consequences are

20    simple probation for general deterrence purposes at the very

21    least, your Honor.  And in light of the real human beings who

22    were affected by the crime, as well as the losses to the

23    insurance companies, the government asks for a guideline

24    sentence.

25             MR. DAYAN:  Judge, as a response to your question

CCIVPEYS                    Sentence

1    whether he was the manager or a manager, the government said

2    they think that he was the manager.  And the reason that they

3    don't know for sure is because when the agent, the case

4    agent -- and I don't believe it was this agent; I think it was

5    another agent -- who had visited the doctor, the doctor had

6    told him that the manager was a person by the name of Mike

7    Gordon.

8            It wasn't Peysakov who was the manager, because

9    Peysakov had a base salary that did not increase or decrease

10   with the volume of patients.  That's why they don't -- I mean I

11   know because I had spoken to the defendant, and he had told me

12   that Mike Gordon was the manager of that clinic.  The

13   defendant's salary never fluctuated.  That's unlike any other

14   manager, the manager, because they always like walk away with

15   like 80 or 70 percent.  Not this case, Judge.  Not this case.

16           THE COURT:  Any response?  I can see the agent talking

17   to you.

18           MS. LAI:  Your Honor, the agent says that she was

19   present at an interview with Dr. Rodriguez.  And Dr. Rodriguez

20   spoke specifically about Natan Peysakov.  So he may have

21   mentioned another manager, but when he was interviewed, he was

22   interviewed about Mr. Peysakov.

23           THE COURT:  That would be the focus of the agent under

24   these circumstances, because he was the named defendant in the

25   case, and that was because of his relationship with the

1   relationship with Chervin.

2            MS. LAI:  Yes, yes, your Honor.

3            THE COURT:  All right.

4            Mr. Peysakov, would you like to say something on your

5   own behalf at this time?

6            THE DEFENDANT:  What was done was completely wrong,

7   and I understand that.

8            MR. DAYAN:  Slow.

9            THE DEFENDANT:  I understand what I'd done was

10  completely wrong and it's illegal.  And I learned from this

11  lesson.  I understand to do -- to live in this country is not

12  the right way to do what I did.  And but I promise I'm not

13  going to do anything illegal for the future, this is for sure.

14  And I fully accept what I've done.

15           THE COURT:  You think you learned from this?

16           THE DEFENDANT:  I learn a lot from this.  And I feel

17  like for the future life, I will never done this in any

18  circumstances.

19           THE COURT:  Isn't there a broader lesson than that

20  about business and manner of doing business?  You do business

21  with construction, you do business in -- you must be getting

22  contracts.

23           I had a client once.  I had a client once in a

24  criminal case, stockbroker case involving a company called

25  Hercules Galleon, which is three or four defendants.

CCIVPEYS

1            And in the course of my representation of this man,

2    he'd never been a stockbroker before.  What he really was was a

3    manager of the family business.  And what he asked me was was

4    there anything wrong with paying people to get contracts.  And

5    that was his question.  And I couldn't believe it.  He was

6    saying, you know, is it all right to bribe.

7            And he was a native American from Chicago.  And he was

8    involved in a criminal case where people were -- he and his

9    brother-in-law and another man were operating this stock fraud.

10   And the idea was to pump the stock up, get brokers to buy the

11   stock, and then after you got to a certain price, you sell it

12   and you make a big profit.  So he was being charged for that.

13           And he actually was very smart about the nature of the

14   fraud, because while they were bidding the stock up, he was

15   selling his stock, even though he was a partner of his

16   brother-in-law and the other man.  And so he was participating,

17   but he was, in effect, sabotaging the scheme, because it didn't

18   allow the stock to go up as high as they had planned or the

19   leaders had planned, two others.

20           But here he was asking me whether it was all right to

21   engage in commercial bribery.  And I realized that his morals

22   were not the kind of morals that we look to in this country.  I

23   don't know if that's come across to you or not, because you're

24   engaged in business, your brother is engaged in business, and

25   I'm sure there's a lot of corruption in certain businesses.

```
 1    And I would think particularly in real estate.  And maybe
 2    corruption is so broad that you feel you've got to engage in it
 3    or you won't get the business.
 4             But that is a crime, commercial bribery.
 5             So how do you feel about that?
 6             THE DEFENDANT:  I feel better to lose the business
 7    than to work in business like this.
 8             THE COURT:  You knew this?
 9             THE DEFENDANT:  No.
10             THE COURT:  You knew that before.
11             THE DEFENDANT:  It's not exactly, but we have to take
12    money from -- but, yeah, I did it before, but I don't want to
13    do it anymore.
14             THE COURT:  In his case it was a little different,
15    because there he probably solicited -- he probably solicited
16    you to do it, with the promise of payment.  But now put it on
17    the other way.  You're going out to get business.  Are you
18    going to be an Aron Chervin or are you going to be your own
19    man?
20             THE DEFENDANT:  I want to be myself.  All myself.
21             THE COURT:  Well, are you done?  I didn't want to
22    interrupt you.
23             THE DEFENDANT:  From this case, from last two years,
24    and my I would say terrible lie, I don't want to do anything
25    with no kickbacks, no briberies.  Work hard, and this is a nice
```

CCIVPEYS                    Sentence

1   way, legal way.  Respect law.

2           MR. DAYAN:  He's not very eloquent, Judge.

3           THE COURT:  He's pretty eloquent.  You should let him

4   talk by himself.

5           THE DEFENDANT:  Give me a chance, and I will never

6   disappoint you.

7           THE COURT:  All right.

8           THE DEFENDANT:  I'm sorry what happened.

9           THE COURT:  Thank you very much, if you're done.

10          You're done?

11          THE DEFENDANT:  Thank you.

12          THE COURT:  While I think about the sentence, I'm

13   going to go through the guideline calculations, which is

14   necessary as a matter of sentencing.

15          This is a violation of -- conspiracy to violate the

16   health fraud and mail fraud laws of the United States, in

17   violation of 18 United States Code, Section 1349.  And the

18   appropriate guideline is found in Guideline 2X1.1, which refers

19   to attempted solicitation and conspiracy.  And that just refers

20   you over to Guideline 2B1.1, because those cover the specific

21   statute 18 United States Code, Section 1341, 1347, which apply

22   to the conspiracy charges in question.

23          And there, the base offense level under Subsection

24   (a)(1) of 2B1.1 is seven.  Because the loss was more than

25   $70,000 to the insurance companies, but less than 120,000, the

offense level is increased by eight levels, and the adjusted

offense level is therefore 15, in which two points are deducted

because the defendant showed recognition of his responsibility

for the offense pursuant to Guideline 2B1.1(a).  That leaves an

adjusted offense level of 13, and a total offense level of 13.

         Defendant has no prior conviction, either adult or

juvenile arrests, for that matter.  And he falls, therefore,

into Criminal History Category I, total offense level of 13.

The guidelines call for a sentence of 12 to 18 months.  12 to

18 months.  And the probation office recommends a sentence of

six months imprisonment, to be followed by three years of

supervised release, with six months served in home detention.

I think that's a split sentence under the guidelines.

         There is no fine recommended.  However, there is --

you are requesting restitution and forfeiture, Ms. Lai?

         MS. LAI:  Yes.  There was already a consent order of

forfeiture that the Court signed at the plea, your Honor.

         THE COURT:  All right.

         And what about restitution?

         MS. LAI:  The forfeiture would be applied towards

restitution, it's the government's intent.

         THE COURT:  Forfeiture would be applied towards

restitution.

         And then there's a special mandatory assessment of

$100.

 1            Turning now to the provisions of 18 U.S.C., Section
 2     3553(a), the Court is required to arrive at a sentence which is
 3     sufficient, but not greater than necessary, to meet the
 4     sentencing factors mentioned in 3553(a), Subsection (2).
 5     3553(a) requires a court to consider in sentencing not only the
 6     nature and circumstances of the offense, and the history and
 7     characteristics of the defendant, but also under Subsection (2)
 8     the -- or Paragraph 2, I should say, the need for the sentence
 9     imposed to reflect the seriousness of the offense, promote
10     respect for the law, and provide just punishment for the
11     offense.  Second, to afford adequate deterrence to criminal
12     conduct.  That refers to deter other people from committing the
13     same crime.  And C, to protect the public from further crimes
14     of the defendant.  And D, to provide that defendant with needed
15     educational or vocational training, medical care, or other
16     correctional treatment in the most effective manner.
17            Difficulty here is that there has to be a deterrent
18     factor to this type of crime.  And I accept that what I've
19     learned about the defendant here at the sentencing hearing and
20     otherwise from reading the reports and all, that he's unlikely
21     to commit a further crime.  Also, that Mr. Dayan's point that
22     this man was essentially raised in Russia until the age of 27,
23     and exposed to an attitude -- maybe I should say what many
24     people over there have with getting away with whatever you can.
25     It's a problem, and an adjustment to the laws of this country

1    is difficult for many of them.  The difficulty really is is how

2    do you provide adequate deterrence for other people.  My

3    difficulty is in this case that there are a lot of Russian

4    immigrants in the case who need -- Mr. Chervin, Mr. Terdjanian,

5    Mr. Dobrer haven't been sentenced.  Mr. Chervin hasn't been

6    sentenced.  A number of the others.  But there are a number

7    that have been sentenced who have even lesser participation in

8    the crimes charged, and for some reason they come up first.

9         On the other hand, I've long taken the position that

10   first offenders -- with first offenders, the judge -- and long

11   before 3553(a) took its place in the Court's consideration at

12   the time of sentence, I took exception to the guidelines

13   provision.  There was no discretion for judges for first

14   offenses on the theory that first offense was a chance for a

15   person to turn themselves around if the judge felt that they

16   were likely that they could.

17        Here, I think the defendant could turn himself around.

18        On the other hand, I have this problem of deterring

19   others, particularly others in the immigrant community coming

20   from behind the Iron Curtain, as it was called.

21        Taking into account the provisions of 3553(a), I'm

22   going to sentence the defendant to -- let me see.  I'm going to

23   sentence him to a period of five years probation, with six

24   months of home confinement, not to interfere with his job, but

25   to require him to be home in the evenings and at times when

1    he's not on the job.  And after that period of six months, to

2    perform 100 hours of community service with an agency approved

3    by the probation office.  And there will be a forfeiture order

4    which has been signed.  A special assessment of $100 will be

5    due in a week -- or this week.

6            The mandatory provisions of supervised release -- or,

7    rather, probation will apply.  That is, that the defendant

8    shall not commit another federal, state, or local crime;

9    defendant shall not illegally possess a controlled substance;

10   defendant shall not possess a firearm or destructive device.

11           Mandatory drug testing is suspended based on the

12   Court's determination that the defendant poses a low risk of

13   future substance abuse.  And defendant shall cooperate in the

14   collection of DNA as directed by the probation officer.

15           Standard conditions of probation 1 through 13 will

16   also apply with the following special conditions:

17           Defendant shall provide the probation officer with

18   access to any requested financial information; defendant shall

19   not incur new credit charges or open additional lines of credit

20   without the approval of the probation officer, unless the

21   defendant is in compliance with any installment payment

22   schedule which the defendant may be subject to as a result of

23   the terms of this sentence; defendant shall comply with the

24   conditions of home confinement.

25           And during this time, you will remain in your place of

residence, except for employment and other activities that

would be religious or medical activities approved by your

probation officer.  And you will maintain a telephone at your

place of residence without call forwarding, a modem, caller ID,

call waiting, or portable cordless telephones during the above

period.

          At the direction of your probation officer -- I'm not

going to require that.

          Home confinement shall commence on the date to be

determined by the probation officer.  And defendant shall pay

the costs of home confinement on a self-payment or copayment

basis as directed by the probation officer.

          Defendant is to report to the nearest probation

officer within 72 hours, and be supervised in the district of

his residence.

          The defendant shall pay to the United States a special

assessment of $100 due this week.

          Now, has the defendant arrived at a date in which he

would pay the amount of the forfeiture order that the Court

ordered?

          MS. LAI:  I don't think a date has been set yet, your

Honor.

          THE COURT:  He said he might.

          MR. DAYAN:  I think that, Judge, just to play it safe,

within 30 days from today.

CCIVPEYS                        Sentence

1        THE COURT:  You will pay it within 30 days from today?

2        MR. DAYAN:  Yes, he would be able to pay the full

3   amount.

4        THE COURT:  You have the funds in hand?

5        MR. DAYAN:  I don't have it at hand, but he's in the

6   process of putting it together.  30 days is more than

7   sufficient time.

8        THE COURT:  Then he has it arranged so that he'll have

9   it in the 30 days?

10        MR. DAYAN:  Yes.

11        THE COURT:  In which case I won't impose a payment

12   schedule.  So the forfeiture amount will be paid in 30 days.

13   Then I don't have to set any kind of percentage of take-home

14   pay to be paid on --

15        MR. DAYAN:  Yes.  He'll be paid within 30 days, Judge.

16        THE COURT:  All right.

17        Now, I think there's no fine, and there's no

18   restitution, in view of the forfeiture order.  No restitution

19   request.

20        You have ten days to file a notice of appeal of your

21   conviction here or your sentence, Mr. Peysakov.  All you have

22   to do is write a letter to the Court, United States Court,

23   Southern District of New York, 500 Pearl Street, New York, New

24   York, and say in the letter, "I appeal."  That will preserve

25   your right to appeal anything in connection with your

1    conviction or your sentence here.  But if you don't send it in

2    within that ten-day period, the Court of Appeals won't hear

3    your appeal; they'll say you waived your right to appeal.  So

4    if you're going to appeal anything about this, send that letter

5    in within that ten-day period.

6            Now, let me tell you why I arrived at this sentence,

7    because it's a break for you.  And I decided that if I would

8    have -- if this were a case involving nonimmigrants, people who

9    were raised in this country, and I was of the opinion that they

10   wouldn't commit other crimes, I would have given you at least

11   this break, maybe even with lesser condition of home

12   confinement.

13           But in this case, it's important that the people in

14   the community who knew of this crime be deterred from

15   committing other crimes.  The difficulty is that you come up in

16   an early time, and Mr. Aron Chervin hasn't been sentenced, and

17   Mr. Dobrer hasn't been sentenced.  And the other people who

18   were much more involved in the case haven't been sentenced.

19   And I felt that their sentences should be severe enough so that

20   other people would be deterred.  And I had enough room with

21   respect to the remaining defendants to send the message that

22   this type of crime should be deterred and shouldn't be engaged

23   in by anyone.  So that was my thinking.

24           Mr. Terdjanian hasn't been sentenced, and Mr. Kuflik

25   hasn't been sentenced, and Vadim Chervin hasn't been sentenced.

 1    So I have more room.

 2              Let me say one thing on the taxes.

 3              Whoever you get on taxes, don't go for one of these

 4    people who will say how much they'll save you on your taxes,

 5    because they have a motive to cheat on your taxes.  They think

 6    they'll get a higher fee from you because they've minimized

 7    your taxes in some way.  You want to get someone who plays

 8    straight with you and plays straight with the government to do

 9    your taxes.  Because you don't want that kind of trouble.  And

10    it costs more.  You have to go through -- you have to pay them

11    through the audit.  They get paid on the audit.  You have to

12    pay more then.  So it doesn't pay.

13              And I know it's more complex in your case if you're

14    engaged in construction and all those things.  And the kind of

15    returns I've had to file, until a couple of years ago I always

16    made out my own.  But then it got too complex, because I

17    couldn't figure out the alternative tax computations.  And when

18    I called the government to ask them about it, they didn't know

19    either; there was only one man in the office that knew, and he

20    was on leave.  So they had to wait till he came back to advise

21    me on the alternative tax.  And even then I didn't understand

22    it.  So I had to hire an accountant, go to Block, H&R Block,

23    and get my taxes done.

24              So, anyway, that's a piece of advice.

25              It seemed to me the other difficulty here was I could

1   see the probation office really recommended the minimum

2   sentence for you under the guidelines, which was a split

3   sentence.  And that meant they did, so it seemed to me, in

4   part, thinking about your children and your wife, being able to

5   take care of the children during your incarceration.  And that

6   means it is no longer the case, because six months have passed

7   since then, and your children are probably old enough for you

8   to take care of them now.  And she probably has to go to work

9   after six months.  That's the usual time for a woman to go back

10  to work and earn the money.

11          So that the probation department, in a sense, was a

12  little bit out of kilter because of the length of time that has

13  gone by, six months later than the time they wrote that report.

14  So that's the reasons that I arrived.  And I'd probably follow

15  the probation department's recommendation if you'd been

16  sentenced six months earlier.

17          Now, look for future life.  You've got a family to

18  bring up.  One of the things you've got to learn here is how

19  important family is.  Because think of what you did in terms of

20  throwing your family into a possible situation where you're not

21  there.  And you went there to support your family.  It doesn't

22  pay to take chances.  Doesn't pay.  It's too important.  Your

23  family is too important.  It's too important to your wife to

24  not have that strain.  It's too important for the children not

25  to have that strain.

1          One thing you find sitting on the bench, anyway, and I

2     think most defendants find is how important it is, the family

3     is, and family support is, and how important their children are

4     to them and their wife is to them.

5          So I wish you luck.  I wish your family luck.  And

6     since you're Jewish, I can't wish you a happy new year and

7     merry Christmas, but I'll wish you happy holidays and good luck

8     for the rest of your life.

9          MR. DAYAN:  Thank you, Judge.

10          It's an advantage actually to be Jewish this time of

11     year, because we celebrate all the holidays.

12          THE COURT:  I know.  You get presents for ten days,

13     don't you?

14          MR. DAYAN:  Yeah, but this is such a merry time of

15     year for everyone.  It doesn't matter.  It's just -- just a

16     beautiful time.  Like my son goes to Jewish school, but he

17     sings Christmas songs.  It's just beautiful songs.  Any

18     religion, it's just beautiful.

19          THE COURT:  That's true.

20          On the other hand, I had to go to Grand Central last

21     Saturday, because I had -- my daughter is adopting a child --

22     one of my daughters is adopting a child from China.  And she

23     just got the notice that she's qualified, and her husband's

24     qualified.  And I had to go up to the country to pick up the

25     notice to send it to her because she lives in Hong Kong.

CCIVPEYS                        Sentence

1    And -- at this point.

2              So I go into Grand Central, and there are more people

3    in Santa Claus clothes than I've ever seen in my life.  There

4    were more of them than there were out of Santa Claus clothes.

5    And I was supposed to meet someone afterwards.  So I said,

6    You'll be able to tell me because I'm not wearing Santa Claus

7    clothes.

8              MR. DAYAN:  Thank you, Judge.

9              Merry Christmas, Judge.  Happy new year.  All the

10   best.  A lot of help to this Court, Judge.  Stay healthy and

11   stay with us for another 20 years.

12             THE COURT:  Thank you very much.

13             MR. DAYAN:  At least.

14             Thank you.

15             THE COURT:  Good luck to you.

16                              *    *    *

17

18

19

20

21

22

23

24

25